UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| JUSTIN DEAN MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:12-CV-00120-BG |
| | ) | ECF |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant.[1] | ) | |

**REPORT AND RECOMMENDATION**

**Statement of the Case**

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Justin Dean Moore seeks judicial review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Pursuant to the Order transferring the case, the undersigned now files this Report and Recommendation.

On June 30, 2011, Moore, Moore's mother, and a vocational expert testified at a hearing before an administrative law judge (ALJ). Moore was not represented by counsel at the hearing. The ALJ determined on August 24, 2011, that Moore was not disabled because he could perform jobs that existed in significant numbers in the national economy. The Appeals Council denied review on May 16, 2012. Therefore, the ALJ's decision is the Commissioner's final decision and

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration, succeeding former Commissioner Michael J. Astrue. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Colvin is automatically substituted as Defendant in this case.

1

properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (holding that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

## **Standard of Review**

A plaintiff is disabled and may be entitled to disability insurance benefits and supplemental security income if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (2013).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2013). "The claimant bears the burden of showing [he] is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps four and five, the Commissioner must assess a claimant's residual functional capacity (RFC), defined as "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a)(1), 416.920(a)(4), 416.945(a)(1).

2

Judicial review of a decision by the Commissioner is limited to two inquiries: a court must "consider only whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447. "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## Factual Background

Moore claims that he became disabled on March 2, 2009, at age twenty-seven due to major depressive disorder and Charcot-Marie-Tooth disease.[2] (Tr. 123, 127, 148.) He is 5 feet, 4 inches tall and weighs 280 pounds. (Tr. 148.) Medical records indicate that Moore has taken psychiatric medication since age seven when his mother discovered that he was self-mutilating. (Tr. 231, 248, 252–53, 309.) The evidence shows that Moore was admitted to a psychiatric institution for addiction in 2003, depression in 2004, and suicidal ideation in 2006. (Tr. 332.) Moore claims that he has held a job for no longer than nine months when he worked as a parts runner from May 2008 to February 2009, which required him to haul oilfield machinery between job sites using a semi-truck. (Tr. 53, 150–51, 157–58.) He also worked as a truck driver for seven months in 2003 and as a gas station attendant for three months in 2006. (Tr. 157.)

## Discussion

A claimant is found disabled at step three if he has an impairment that satisfies the twelve-

---

[2] Charcot-Marie-Tooth disease, also known as peroneal muscular atrophy, is "a generic title for at least three distinct hereditary neuromuscular disorders" that result in "marked wasting of the more distal portion of the limbs, particularly the peroneal muscle groups (resulting in the characteristic 'stork legs')." *Stedman's Medical Dictionary* 179, 553 (28th ed. 2006).

month duration requirement and meets or equals an impairment listed in Appendix 1 of the regulations governing Social Security claims (listing).  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). In this case, the ALJ concluded that Moore's mental impairments did not meet or medically equal Listing 12.04, which describes certain affective disorders. (Tr. 26.) To meet or equal Listing 12.04, a claimant must satisfy either subsection B or C of that listing.  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. The ALJ found that Moore did not satisfy either of these subsections, and Moore argues that substantial evidence does not support this conclusion. (Tr. 26, 31.) This argument has merit and requires remand.

> To satisfy subsection B, a claimant must display at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(B). Pursuant to the regulations, a marked limitation arises when "the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(C). The ALJ found that Moore did not meet or equal subsection B in part because he experienced only mild difficulties in maintaining social functioning and no episodes of decompensation. (Tr. 26, 31.) Substantial evidence does not support these findings.

The regulations define social functioning as a claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404,

4

Subpt. P, App. 1 § 12.00(C)(2). A claimant "may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation." *Id.*

In February 2009, Moore was admitted to a psychiatric hospital for three days after he tried to shoot himself. (Tr. 215–16.) During that hospitalization, a counselor observed that Moore had poor social skills, isolated himself, and had little social activity. (Tr. 374–75.) Two days after his discharge from the hospital, Moore had an appointment at the Texas Panhandle Mental Health and Mental Retardation Center (MHMR), where he reported a history of violence, impulsive behaviors, and mood swings. (Tr. 277.) The following month, Moore told an MHMR physician that he had recently been accused of sexual harassment while drunk but did not know whether charges were brought. (Tr. 309.)

In July and August of 2009, Moore was admitted to a psychiatric hospital for twelve days after telling police that he was thinking of raping his former boss and had sexually harassed women over the telephone. (Tr. 209–10.) The psychiatrist who evaluated Moore upon intake found that hospitalization was justified in part because Moore's condition had resulted in "significant loss of functioning" and because he was a danger to himself and others. (Tr. 211.) The psychiatrist also noted that Moore was disheveled, dirty, unkempt, guarded, and irritable. (Tr. 213.) Earlier that day, an MHMR counselor examined Moore and noted that he was distracted and presented with poor judgment, illogical thought content, and grandiose delusions. (Tr. 274.) The counselor concluded that Moore was at moderate homicidal risk due to his ideation, threats, intent, and access to weapons. (Tr. 273.)

In September 2009, Moore was jailed for seven days for stalking his former boss, whom he

5

had threatened with a gun. (Tr. 205, 231, 269.) An MHMR counselor who examined Moore in jail concluded that he was at high homicidal risk due to his ideation, threats, plan, intent, and access to guns. (Tr. 269.) The counselor noted that Moore was distracted with poor judgment and illogical thought content. (Tr. 270.) According to the counselor, police opined that Moore was a danger to others but that a psychiatric hospital was a more appropriate location for him than jail. (Tr. 271, 286.) The MHMR counselor arranged for Moore to remain at the jail until he could be safely transported to a psychiatric hospital. (Tr. 286.)

Moore was admitted to a psychiatric hospital for twenty-five days for management of his stalking behavior. (Tr. 205.) He was then committed to another psychiatric facility, where he remained for twenty more days after being found to be a high risk of danger to others, requiring checks every fifteen minutes. (Tr. 205, 223, 227–28, 234.) During his commitment, a social worker interviewed Moore and his mother and found that Moore's weaknesses included poor interpersonal and coping skills and a severe degree of dysfunction. (Tr. 253.) According to the social worker, Moore stated that he spent his time alone when he was not in the act of stalking women and that he conducted autopsies on dead animals. (Tr. 250–51.) Moore's mother reported that he had "never known how to socialize appropriately" or had a friend. (Tr. 248, 250, 253.)

A psychologist who examined Moore during his commitment noted that he admitted being a "loner" and had a history of being bullied by others and fighting at school. (Tr. 256.) The psychologist also noted that Moore had a neutral affect but "became animated when talking about how easy it is to stalk someone." (Tr. 257.) The psychologist concluded that Moore tended to have a hostile attitude toward others and that he could become angry, not show it, and then act out in a violent manner with little warning. *Id.* After diagnosing him with a mood disorder and antisocial

personality disorder, the psychologist recommended intensive therapy aimed at dealing with Moore's "antisocial behaviors which got him arrested." (Tr. 257–58.)

MHMR providers who oversaw Moore's psychiatric treatment after his commitment ended indicated that he largely remained at the family ranch where he lived with his mother and did not leave "to stay out of trouble." (Tr. 267–68, 280, 284, 298, 361, 364, 377, 385.) In February 2010, Moore told an MHMR physician that he was recently overwhelmed by company that had visited for the holidays. (Tr. 296.) He further stated that he got angry at others and would be in jail if he did not take his medication. *Id.* An MHMR physician who examined Moore in December 2010 observed that Moore had an "awkward style" of social interaction and spent Thanksgiving alone at his family ranch. (Tr. 383.)

In July of 2010, consulting psychologist Steven C. Schneider, Ph.D., examined Moore in connection with his applications for benefits. (Tr. 332–34.) According to Dr. Schneider, Moore reported that he was bullied and would "get ferocious and throw desks and chairs" in school. (Tr. 332.) Dr. Schneider concluded that Moore socialized regularly with family but never with friends, felt uncomfortable in crowds, and related poorly with Dr. Schneider and office staff. (Tr. 334.) Dr. Schneider specifically found that Moore was a "loner" and lacked social contacts. *Id.*

In documents that Moore submitted in connection with his applications for benefits, he reported that he had problems getting along with others because of his mood swings and that he had been fired from a job for harassing others. (Tr. 187–88.) When asked whether he spent time with others, Moore stated that he stood around and listened at a gas station. (Tr. 186.)

In sum, the overwhelming majority of the evidence shows that Moore has a "history of altercations, . . . firings, . . . avoidance of interpersonal relationships, [and] social isolation" such that

7

substantial evidence does not support the ALJ's conclusion that Moore experienced only mild difficulties in social functioning    20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(2).

Substantial evidence also does not support the ALJ's conclusion that Moore's mental impairments "have not resulted in any episodes of decompensation[.]" (Tr. 31.) The regulations define episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(4). Pursuant to the regulations, episodes of decompensation "may be inferred from . . . documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household)[.]" *Id.*

As previously explained, the evidence of record shows that Moore was admitted to psychiatric facilities for at least three separate episodes in 2009. He spent three days in a psychiatric hospital in February 2009, twelve days in a psychiatric hospital in July 2009, and more than six weeks in two separate psychiatric facilities in September and October of that year. (Tr. 205, 209–10, 215–16, 223.) Thus Moore did in fact experience episodes of decompensation during the relevant time frame.

In addition, substantial evidence does not support the ALJ's conclusion that Moore's mental impairments did not satisfy subsection C of Listing 12.04. (Tr. 26, 31.) A claimant can satisfy subsection C by showing a "history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and a "history of 1 or more years'

8

inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(C).

The regulations define affective disorder as a disorder "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Id.* § 12.04. Major depressive disorder and bipolar disorder have these characteristics. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 345 (4th ed., text rev. 2000) (describing the characteristics of major depressive disorder and bipolar disorder). The evidence of record shows that Moore was treated for these disorders from at least February 2009 through April 2011 and probably much longer. (Tr. 205, 246, 288–90, 294, 355, 360, 362, 378, 384, 386 (bipolar disorder); 210, 246, 279–80, 283–84, 286, 306, 308, 310, 364, 373, (major depressive disorder); 216, 332 (hospitalized for depression in 2006); 231, 248, 309, 252–53 (antidepressant medication since age seven).) Likewise, the previously summarized evidence shows that Moore's disorders caused him more than minimal limitations in basic work activities such as using judgment and responding appropriately to supervision and coworkers despite attenuation by medication and psychosocial support. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (giving examples of basic work activities).

Finally, the evidence shows that Moore remained in highly supportive living arrangements such as jail, psychiatric facilities, and his family ranch where he lived with his mother throughout the relevant period. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F) (noting that a highly structured and supportive setting may be found in a claimant's home). The evidence also indicates a continued need for such an arrangement: during his October 2009 commitment, a social worker noted that Moore was dependent in his family home, and an examining psychologist opined that Moore would likely "need to be closely supervised when he is released, so that his behavior can be

9

tracked." (Tr. 248, 258.) After being discharged from the psychiatric facility, an MHMR counselor observed that Moore's work at his family ranch assisted with managing his symptoms. (Tr. 284.)

The ALJ explained his findings regarding subsections B and C of Listing 12.04 by discounting Moore's hospitalizations and commitment as "isolated incidents." (Tr. 31.) In addition, he mistakenly found that Moore told Dr. Schneider that he got along well with friends, but Dr. Schneider found that Moore never socialized with friends. (Tr. 31, 334.) The ALJ also found that MHMR providers "consistently noted that [Moore's] mental status examinations were unremarkable[,]" which is belied by the previously discussed MHMR records. (Tr. 31.) In addition, the ALJ noted that findings of state agency consultants supported his conclusions. (Tr. 31–32.) Like the ALJ, these non-examining consultants found that Moore did not satisfy subsection C and experienced mild difficulties in maintaining social functioning and no episodes of decompensation of extended duration. (Tr. 350–51.) However, the ALJ could not properly rely on these findings because they were contradicted by the previously described findings of Dr. Schneider and other examining and treating sources. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) ("[A]n ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and do not contradict those of the examining physician."). In view of the evidence as a whole, the state agency findings are not "such relevant evidence as a reasonable mind might accept as adequate to support" the conclusions reached by the ALJ at step three. *Watson*, 288 F.3d at 215.

Because substantial evidence does not support the ALJ's disability determination, remand is warranted. *See, e.g., Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (remanding case due to lack of substantial evidence). The undersigned does not reach Moore's remaining arguments.

10

**Conclusion**

For the foregoing reasons, the undersigned recommends that the United States District Court **REVERSE** and **REMAND** the Commissioner's decision for administrative proceedings consistent with this Report and Recommendation.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. 28 U.S.C. § 636(b)(1) (2013); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to timely file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

Dated: May 23, 2013.

NANCY M. KOENIG
United States Magistrate Judge